UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY FOOTE,

       Plaintiff,                                Hon. Wendell A. Miles

v.                                                            Case No. 1:04-CV-380

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.

        The Commissioner determined that Plaintiff is not disabled as defined by the Act. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## **STANDARD OF REVIEW**

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 48 years of age at the time of the ALJ's decision. (Tr. 13). She possesses an eleventh grade education and worked previously as an emergency medical technician (EMT), certified nursing aide, and housekeeper. (Tr. 13, 50, 62-65).

Plaintiff applied for benefits on December 10, 2001, alleging that she had been disabled since July 16, 2001, due to degenerative joint disease and fibromyalgia. (Tr. 43-46, 49). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 26-42). On December 3, 2003, Plaintiff appeared before ALJ Thomas Walters, with testimony being offered by Plaintiff and vocational expert, Sandra Steele. (Tr. 573-609). In a written decision dated March 22, 2004, the ALJ determined that Plaintiff was not disabled. (Tr. 12-21). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 4-6). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## MEDICAL HISTORY

On February 23, 2001, Plaintiff twisted her right knee while working. (Tr. 93). X-rays of her knee were unremarkable and revealed no evidence of osseous pathology. (Tr. 186). On March 1, 2001, Plaintiff participated in an initial physical therapy evaluation. (Tr. 93-95). Plaintiff

reported that her knee pain ranged from 5-10 (on a scale of 1-10). (Tr. 93). She also complained of swelling in her knee. *Id.* On examination, the therapist observed neither swelling in Plaintiff's right lower extremity nor range of motion abnormality. (Tr. 93-94). On March 20, 2001, Plaintiff was discharged from physical therapy for non-attendance. (Tr. 99).

On May 14, 2001, Plaintiff underwent arthroscopic surgery, performed by Dr. Aleksandar Tosic, on her right knee to repair a tear of the medial meniscus. (Tr. 233). Plaintiff subsequently participated in physical therapy, reporting on July 3, 2001, that "her knee joint rarely hurts." (Tr. 227). She further reported that she had returned to her normal work duties without restriction. *Id.*

On July 10, 2001, Plaintiff was examined by Dr. Tosic. (Tr. 258). Plaintiff reported that she was experiencing "a lot of trouble" with her left knee, but "almost no pain" in her right knee. An examination of Plaintiff's left knee revealed tenderness, but no swelling or effusion. X-rays revealed "moderate" degenerative joint disease for which the doctor recommended future arthroscopy. *Id.*

On July 18, 2001, Plaintiff was examined by Dr. Mark Zook. (Tr. 127). Plaintiff reported that she was experiencing pain in her shoulders, hips, knees, and back. Plaintiff exhibited "some difficulty" with range of motion testing as well as "tender point pain." Dr. Zook diagnosed Plaintiff with fibromyalgia and modified her medication regimen. *Id.* The doctor also recommended to Plaintiff that she exercise, lose weight, and obtain a more sedentary job. (Tr. 126).

On July 30, 2001, Plaintiff underwent arthroscopic surgery on her left knee performed by Dr. Tosic. (Tr. 115). Specifically, the doctor performed "major synovectomy, partial medial meniscectomy, chondroplasty of the patella and medial femoral condyle." *Id.* When examined on

August 7, 2001, Plaintiff exhibited full range of motion in her left knee and reported that "most of the pain [in her left knee was] completely gone." (Tr. 257).

On August 28, 2001, Plaintiff was examined by Dr. Zook. (Tr. 124). Plaintiff reported that she was experiencing bilateral knee pain. An examination of Plaintiff's knees revealed crepitus and swelling. Range of motion testing was "approximately 75% of normal." The doctor diagnosed Plaintiff with "severe" degenerative joint disease and again instructed Plaintiff to exercise, lose weight, and obtain a more sedentary job. *Id.*

On October 10, 2001, Plaintiff was examined by Dr. Tosic. (Tr. 256). Plaintiff reported that she was experiencing "significant" pain in her left knee. *Id.*

On November 9, 2001, Plaintiff was examined by Dr. Girish Juneja. (Tr. 207-10). Plaintiff reported that she was experiencing "aches and pains everywhere," as well as "problems" with her left knee. (Tr. 207). Plaintiff exhibited crepitation and reduced range of motion in her left knee. (Tr. 208). The doctor observed that "at least 14 out of 18 tender points are present," but also noted that there was no evidence of "significant atrophy, malalignment, limb-line discrepancy, asymmetry, abnormal posture, skin changes, or deformity." *Id.* Plaintiff was diagnosed with fibromyalgia, osteoarthritis and bursitis of the left knee, ulnar neuropathy, and anxiety. (Tr. 209).

On November 26, 2001, Plaintiff was examined by Dr. Juneja. (Tr. 113-14). Plaintiff reported that she was experiencing generalized pain. (Tr. 113). The doctor observed generalized tenderness at 16 of 18 fibromyalgia tender points. Range of motion in Plaintiff's left knee was

"within functional limits." Hoffman's sign[1] was negative. An examination of Plaintiff's extremities was unremarkable and the doctor reported that Plaintiff was "neurologically stable." *Id.*

On December 17, 2001, Plaintiff was examined by Dr. Juneja. (Tr. 111-12). Plaintiff reported that she was experiencing "overwhelming" pain and was "very much depressed." (Tr. 111). Plaintiff exhibited tenderness at 14 of 18 fibromyalgia tender points. Plaintiff exhibited "functional" range of motion in her extremities, as well as "5-/5" strength throughout. The doctor reported that Plaintiff was "neurologically stable." *Id.*

On January 17, 2002, Plaintiff was examined by Dr. Juneja. (Tr. 200-01). Plaintiff reported that she had experienced a "significant improvement" in her symptoms. An examination revealed "localized tenderness" throughout and the presence of "12/18 tender points." (Tr. 200). The doctor instructed Plaintiff to continue her home exercise program. (Tr. 201).

On January 21, 2002, Plaintiff was examined by Dr. Tosic. (Tr. 254). Plaintiff reported that she was continuing to experience pain in her left knee. The doctor treated Plaintiff with an injection of Synvisc.[2] *Id.*

On January 23, 2002, Dr. Zook reported that Plaintiff was "disabled from any form of work except sedentary employment." (Tr. 249).

On January 28, 2002, Plaintiff completed a questionnaire regarding her activities. (Tr. 79-82). Plaintiff reported that she "sometimes" cooks, twice weekly performs light housework, and

---

[1] Hoffman's sign is an indicator of a number of neurological conditions including cervical spondylitis, other forms of spinal cord compression, and multiple sclerosis. *See* Hoffman's Sign, available at, http://www.mult-sclerosis.org/Hoffmanssign.html (last visited on May 24, 2005).

[2] Synvisc is an injectable medication containing Hyaluronan, a major molecular component of synovial fluid. The high viscosity of synovial fluid allows the cartilage surfaces of joints to glide upon each other in a smooth fashion. Synvisc is often referred to as "motor oil" for the knee joint. *See* Synvisc, available at, http://orthopedics.about.com/cs/treatment/a/synvisc.htm (last visited on May 24, 2005).

she goes shopping once a week (Tr. 79-80). She also reported that she reads and watches television. (Tr. 81). Plaintiff reported that she is unable to carry "heavy items" and experiences difficulty dressing because of the pain in her arms and legs. (Tr. 79-80).

Plaintiff received a second injection of Synvisc on January 28, 2002, and a third such injection on February 4, 2004, after which Plaintiff reported that her knee felt "better." (Tr. 252-53).

On April 15, 2002, Plaintiff was examined by Dr. Juneja. (Tr. 449-50). Plaintiff reported that she recently began participating in aquatic therapy with "some improvement in [her] symptoms." (Tr. 449). Plaintiff also reported that "overall things are better" with her present medication. *Id.*

On June 19, 2002, Plaintiff was examined by Dr. Juneja. (Tr. 445-46). Plaintiff reported experiencing pain in her right upper extremity, as well as pain and swelling in her left knee. (Tr. 445). An examination of Plaintiff's left knee revealed "minimal" effusion, "but no significant instability." The doctor observed the presence of 16/18 tender points, but noted that Plaintiff exhibited "normal" tone in all her extremities with no evidence of cyanosis, clubbing, or edema. Hoffman's sign was negative and Plaintiff was neurologically stable. *Id.* Dr. Juneja modified Plaintiff's medication regimen. (Tr. 446). When examined on July 11, 2002, Plaintiff reported that she "was feeling better" and that her pain was under better control. (Tr. 438).

On August 8, 2002, Plaintiff was examined by Dr. Juneja. (Tr. 436-37). Plaintiff reported that she was experiencing generalized body pain which rated 10 (on a scale of 1-10). (Tr. 436). Plaintiff exhibited diminished range of motion in her shoulders and "slightly" diminished grip strength. An examination of her left knee revealed tenderness with "minimal" effusion and crepitation. The results of the examination were otherwise unremarkable. As the doctor reported,

7

Plaintiff exhibited normal tone and sensation in her extremities. *Id.* Plaintiff's deep tendon reflexes were intact with no evidence of atrophy, malalignment, limb-length discrepancy, cyanosis, clubbing, edema, or neurological instability. (Tr. 436-37). The doctor reported that all of Plaintiff's "lab work-up" had "come out to be within normal limits." (Tr. 437).

On September 19, 2002, Plaintiff was examined by Dr. Juneja. (Tr. 429-31). Plaintiff reported that her pain was "better somewhat" and that "the current treatment is helping." (Tr. 429). Nonetheless, Plaintiff reported that her "pain in the morning is 10 [on a scale of 1-10], at midday it is 10, and during the night it is 10." The doctor noted that Plaintiff "appears comfortable." *Id.* Plaintiff exhibited tenderness and impingement in her right shoulder and tenderness in both knees, but otherwise the results of the examination were unremarkable. (Tr. 430). The doctor observed no evidence of spinal deformity, diminished strength, range of motion, or sensation. There was no evidence of instability in the joints of Plaintiff's upper and lower extremities. Plaintiff exhibited normal peripheral pulses and intact deep tendon reflexes. Plaintiff's gait was normal and she was neurologically stable. *Id.*

On February 26, 2003, Plaintiff was examined by Dr. Juneja. (Tr. 303-04). Plaintiff reported that she was experiencing knee pain, lower back pain, and fibromyalgia-like symptoms. (Tr. 303). Plaintiff reported that her pain rated 10 on a scale of 1-10. *Id.* Plaintiff exhibited "multiple" fibromyalgia trigger points, but the results of an examination were otherwise unremarkable. (Tr. 303-04).

On March 26, 2003, Dr. Juneja reported that Plaintiff "is currently undergoing [a] rehabilitation program and seems to be progressing very well." (Tr. 301). Plaintiff exhibited diffuse

tenderness in her right shoulder as well as 12/18 fibromyalgia tender points, but the results of the examination were otherwise unremarkable. *Id.*

On October 23, 2003, Plaintiff was examined by Dr. Zook. (Tr. 492). Plaintiff reported that she was experiencing "exquisite" pain, instability in her knees, and numbness "with any motion." She reported that her pain was constant and unbearable. Upon examination, Plaintiff was "in no acute distress." She exhibited stiffness and diminished range of motion in her neck, diminished muscle tone in her shoulders, diminished strength in her right lower extremity, and multiple trigger points "around the shoulders." The results of the examination were otherwise unremarkable. *Id.*

On November 16, 2003, Plaintiff participated in an MRI examination of her right knee, the results of which revealed the presence of osteoarthrosis. (Tr. 493).

On December 5, 2003, Dr. Zook completed a Medical Assessment of Ability to do Work-Related Activities (Physical) regarding Plaintiff's physical limitations. (Tr. 568-70). The doctor reported that during an 8-hour workday, Plaintiff can sit for 4 hours, stand for 1-2 hours, walk for 30 minutes, and sit/stand for 5 hours. (Tr. 568). Dr. Zook reported that Plaintiff can occasionally lift 20 pounds and frequently lift 10 pounds. *Id.* The doctor reported that Plaintiff experiences no limitations with respect to her ability to perform simple grasping or fine finger movements. (Tr. 569). The doctor reported that Plaintiff can occasionally push/pull 20 pounds with either upper extremity. As for postural limitations, Dr. Zook reported that Plaintiff can frequently reach above shoulder level, occasionally bend, squat, and climb stairs, but can never twist, kneel, crouch, crawl, or stoop. *Id.*

9

Dr. Zook also completed a Medical Assessment of Ability to do Work-Related Activities (Mental) form regarding Plaintiff's non-exertional limitations. (Tr. 571-72). With respect to Plaintiff's ability to make occupational adjustments, the doctor characterized Plaintiff's ability as "good" in the following categories: (1) follow work rules, (2) relate to co-workers, and (3) deal with the public. (Tr. 571). Plaintiff's abilities were characterized as "fair" in the following categories: (1) use judgment, (2) interact with supervisors, and (3) function independently. Finally, her abilities were characterized as "poor/none" in the following categories: (1) deal with work stresses and (2) maintain attention/concentration. *Id.*

Dr. Zook concluded that Plaintiff's ability to understand, remember, and carry out simple job instructions was "good." (Tr. 572). As for Plaintiff's ability to make personal and social adjustments, the doctor described as "fair" Plaintiff's ability to: (1) maintain personal appearance and (2) relate predictably in social situations. The doctor characterized as "poor/none" Plaintiff's ability to: (1) behave in an emotionally stable manner and (2) demonstrate reliability. *Id.*

At the administrative hearing Plaintiff testified that because of her pain she is forced to spend eight hours daily in a recliner with her feet elevated. (Tr. 582-83). She testified that she can "get up and move around" for 10-15 minutes before she must return to her recliner. (Tr. 583). Plaintiff reported that 4-5 times each week she experiences knee pain which rates as 10 (on a scale of 1-10). (Tr. 586). She testified that her pain *averages* between 8-10. (Tr. 587).

Plaintiff testified that her fibromyalgia causes her to experience pain in her hip, back, shoulders, neck, and lower extremities. *Id.* She reported that is unable to open jars and cannot lift "anything" for periods of time lasting "a week or two." (Tr. 590-93). Plaintiff reported that four

times each week the pain in her feet is so severe that she is completely unable to walk for "most of the day." (Tr. 595). Plaintiff also claimed that she was suffering from bi-polar disorder. (Tr. 597).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[3] If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1420(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

### B. The ALJ's Decision

The ALJ found that Plaintiff suffers from the following severe impairments: fibromyalgia, status post knee arthroscopies, back pain, mild obesity, and possible rheumatoid

---

[3] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

arthritis. (Tr. 17). The ALJ determined that these impairments, whether considered alone or in combination, fail to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. *Id.* The ALJ further determined that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 17-20). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1. The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform sedentary work subject to the following restrictions: (1) no lifting or carrying more than 10 pounds, (2) no prolonged walking, (3) no repetitive climbing, (4)

no more than occasional gripping, grasping, pushing, or pulling, and (5) she requires a sit/stand option. (Tr. 19). As for Plaintiff's alleged mental impairments, the ALJ concluded that Plaintiff experiences mild difficulties completing the activities of daily living, mild limitations in maintaining social functioning, moderate difficulties maintaining concentration, persistence, or pace, and has never experienced decompensation in a work setting. The ALJ concluded that Plaintiff would be unable to consistently carry out complex or detailed instructions and, therefore, was further limited to the performance of unskilled work. *Id.* After reviewing the relevant medical evidence, the undersigned concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could no longer perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964.

While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, her limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Sandra Steele.

The vocational expert testified that there existed approximately 7,900 jobs which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 605-06). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold).

a. The ALJ Properly Assessed Dr. Zook's Opinion

On December 5, 2003, Dr. Zook completed a report regarding Plaintiff's ability to perform work activities. (Tr. 568-70). As part of this evaluation, the doctor reported that during an 8-hour workday, Plaintiff can sit for 4 hours, stand for 1-2 hours, walk for 30 minutes, and sit/stand for 5 hours. (Tr. 568). Plaintiff asserts that because Dr. Zook was her treating physician, the ALJ was required to accord controlling weight to this particular portion of the doctor's report. Plaintiff asserts that this portion of Dr. Zook's report is inconsistent with the ALJ's RFC determination.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at

\*2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ is not bound by conclusory statements, particularly when unsupported by detailed objective criteria and documentation. *See Cohen*, 964 F.2d at 528. Finally, the ALJ need not defer to an opinion contradicted by substantial medical evidence. *See Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

As noted above, Dr. Zook consistently reported that Plaintiff was capable of performing sedentary work, a conclusion supported by the results of his several examinations of Plaintiff. The results of Dr. Juneja's numerous examinations of Plaintiff also fails to support the conclusion that Plaintiff is incapable of performing sedentary work. In sum, to the extent that Dr. Zook's December 5, 2003 report is interpreted as precluding Plaintiff from performing sedentary work, such is contradicted by the evidence of record. Thus, there exists substantial evidence to support the ALJ's decision to discount Dr. Zook's opinion.

b. The ALJ Properly Discounted Plaintiff's Subjective Allegations

The ALJ concluded that Plaintiff's subjective allegations of pain and limitation were "somewhat overstated and inconsistent with the available evidence." (Tr. 18). Plaintiff asserts that the ALJ improperly discounted her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d

525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony") (citations omitted). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand.

The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

Medical examinations consistently failed to discern an objective basis to support or confirm Plaintiff's allegations of extreme pain and limitation. The record also reveals that Plaintiff's condition improved with medication and therapy. It is not disputed that Plaintiff suffers from severe impairments, however, as the ALJ properly concluded, "the objective record does not fully support [Plaintiff's] assertions as to the frequency, duration, and intensity of her symptoms, including her expressed level of fatigue and reported need to sit and/or recline with her legs elevated some 8-hours each day." (Tr. 18). In sum, there exists substantial evidence to support the ALJ's credibility determination.

### c. The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 7,900 such jobs. Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon her response thereto.

## **CONCLUSION**

As articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: June 20, 2005                                     /s/ Ellen S. Carmody
                                                        ELLEN S. CARMODY
                                                        United States Magistrate Judge